IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| HENRY THOMAS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CITY OF CHICAGO, Former | ) | |
| CHICAGO POLICE SERGEANT | ) | |
| RONALD WATTS, FORMER OFFICER | ) | |
| KALLATT MOHAMMED, | ) | |
| SERGEANT ALVIN JONES, | ) | |
| OFFICER KENNETH YOUNG JR., | ) | |
| OFFICER CALVIN RIDGELL, JR., | ) | |
| OFFICER GEROME SUMMERS, JR., | ) | |
| OFFICER RONALD HEARD, | ) | |
| OFFICER DARYL AKINS, PHILIP J. | ) | |
| CLINE, KAREN ROWAN, DEBRA | ) | |
| KIRBY, and other as-yet-unidentified | ) | |
| Officers of the Chicago Police Department. | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Henry Thomas, by his attorneys, Loevy & Loevy, hereby complains

against the Defendants, City of Chicago, former Chicago Police Sergeant Ronald

Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones,

Officer Kenneth Young, Jr., Officer Calvin Ridgell, Jr., Officer Gerome Summers,

Jr., Officer Ronald Heard, Officer Daryl Akins, Police Superintendent Philip Cline,

Karen Rowan, Debra Kirby, and other as-yet-unidentified officers and employees of the Chicago Police Department, and states as follows:

## Introduction

1. Henry Thomas was sentenced to four years in prison for a drug crime he did not commit. In fact, the crime never even happened; it was completely fabricated by Chicago police officers.

2. At the time of Mr. Thomas's wrongful conviction, he lived in the seven-story Ida B. Wells building at 527 E. Browning Avenue, a public housing complex that was heavily policed by corrupt Chicago police officers.

3. A tainted crew of officers who once ruled virtually unchecked at the Ida B. Wells building sought bribes, planted drugs, and accused residents like Mr. Thomas of possessing drugs they did not possess.

4. Although Mr. Thomas maintained his innocence, he faced substantial prison time if convicted of the false drug charges. The state offered him a plea agreement and, mindful that a trial would turn on his words versus the officers', he accepted the plea.

5. After Mr. Thomas had already completed his sentence, Defendants Watts and Mohammed were caught on tape engaging in the exact type of misconduct that Mr. Thomas had alleged against them.

6. The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served time in federal prison.

7. Evidence has now come to light showing that Watts and his police team members engaged in an ongoing pattern of criminal misconduct against public housing residents and visitors and that Chicago Police Department officials knew about that pattern dating at least as far back as 2004.

8. For example, on or after November 16, 2017, following the decision of the Cook County State's Attorney Office (CCSAO) to vacate the convictions of 15 individuals—including Mr. Thomas—Defendants Jones, along with other members of Watts's crew, were placed on desk duty.

9. In addition, the CSSAO will no longer call Defendants Jones as a witness "due to concerns about [his] credibility and alleged involvement in the misconduct of Sergeant Watts."

10. Through this lawsuit, Mr. Thomas seeks accountability and compensation for being deprived of his liberty as a result of Defendants' misconduct.

## Jurisdiction and Venue

11. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

12. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located

here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

14.     Mr. Thomas is 38-years old. He currently lives in Chicago, Illinois. At the time of the events giving rise to this suit, Mr. Thomas lived in the Ida B. Wells housing complex in Chicago, Illinois.

15.     At all relevant times, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Kenneth Young, Jr., Officer Calvin Ridgell, Jr., Officer Gerome Summers, Jr., Officer Ronald Heard, and Officer Daryl Akins were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under color of law. Collectively, these individual Defendants are referred to as "Defendant Officers."

16.     At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex. Some of the Defendant Officers, including Defendants Mohammed and Jones, worked on Watts's tactical team.

17.     At all relevant times, Defendant Philip J. Cline was the Superintendent of the Chicago Police Department.

18.     At all relevant times, Defendants Karen Rowan and Debra Kirby were Assistant Deputy Superintendents of the Chicago Police Division, acting as the

head of CPD's Internal Affairs Division. Collectively, these defendants, along with Defendant Cline are referred to as "Defendant Supervisory Officers."

19. The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD"). The City is responsible for the policies, practices, and customs of the City and the CPD.

## Factual Background

20. On February 5, 2003, Mr. Thomas was in the lobby of 527 E. Browning Avenue, also known as the Ida B. Wells public housing unit. He was on crutches because he had recently been in a car accident.

21. While Mr. Thomas was in the lobby, several officers working for Watts, including Defendant Jones and others, entered the lobby.

22. As Mr. Thomas began to hobble out the back exit of the lobby, Jones grabbed him, brought him back inside, and handcuffed him.

23. The officer searched Mr. Thomas but found nothing. Jones then punched Mr. Thomas in the stomach and accused him of yelling for others to hide drugs, which he had not done.

24. A few moments later while Mr. Thomas was still cuffed, Defendant Watts came down into the lobby from the stairs. Jones told Watts that Mr. Thomas had yelled for others to clean up. Watts responded by saying that he was going to falsely arrest Mr. Thomas for any drugs that Watts and his crew recovered.

5

25. Mr. Thomas was arrested, and he was brought to the Chicago Police Department on 51st and Wentworth along with others who were arrested at the same time. They were chained to a bench at the station. While they were chained to the bench, Watts sat at a table across from them and took a large bag of cocaine out of his pocket. He poured the cocaine on the table and separated it into several smaller piles. First, Watts said that each person who had been arrested would be charged with felonies. Then, he turned to another officer and told that officer to claim that all of the drugs were Mr. Thomas's, in retaliation for Mr. Thomas allegedly telling others to hide drugs.

26. On the basis of the false reports and evidence prepared by the Defendant Officers, Mr. Thomas was prosecuted for a crime he did not commit.

27. Even though Mr. Thomas continued to assert his innocence, he was aware that a trial could result in a significant prison sentence, and that the outcome of the trial would depend on whether the fact-finder believed him or the Defendant Officers.

28. Mr. Thomas therefore accepted a plea deal that resulted in a sentence of four years of incarceration.

29. Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified a police report related to Mr. Thomas's arrest.

30. Defendant Officers never disclosed to the prosecutors any of their misconduct described herein.

31.     If the prosecutors had known that Defendant Officers fabricated evidence, lied under oath, and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Thomas, and his unlawful deprivation of liberty would not have been continued.

32.     Given that the entirety of the State's case against Mr. Thomas rested on Defendant Officers' fabrication of evidence and the credibility of Defendant Officers, the exculpatory evidence described in the preceding paragraphs would have been material to Mr. Thomas's defense of his criminal charges.

### Defendant Watts and His Crew Engaged in a Pattern of Misconduct For At Least A Decade, All Facilitated by the City's Code of Silence

33.     In 2003, when Mr. Thomas was arrested and charged, it was no secret within CPD that Watts and his crew engaged in the type of misconduct of which Mr. Thomas accused them.

34.     Government officials, including those with the City of Chicago, had knowledge of Watts's and his crew's misconduct as early as 1999.

35.     By 2004, an FBI investigation of Watts and his crew was well underway. The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Division ("IAD").

36.     Because IAD was kept abreast of the FBI investigation, City officials—including but not limited to the head of IAD and CPD Superintendent Philip J. Cline—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug

37. According to another source who was interviewed, Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. According to the source, Watts also used drug dealers as phony informants to obtain illegitimate search warrants and Watts also offered to let arrestees go if they provided him with weapons.

38. Targets of the FBI investigation extended beyond Watts to members of Watts's tactical team.

39. By 2010, the FBI investigation generated evidence to show that Watts engaged in systemic extortion of drug dealers, theft, the possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

40. Investigators also determined that Watts and his subordinates had engaged in these activities for the prior ten years.

### Watts and Mohammed Are Charged With Federal Crimes

41. In 2012, after at least a decade of engaging in criminal misconduct, Defendants Watts and Mohammed were caught red-handed, shaking down a person they thought was a drug courier, but was actually an agent for the FBI.

42. The United States government subsequently charged Watts and Mohammed with federal crimes.

43. Watts and Mohammed each pled guilty to federal criminal charges and were sentenced to terms of imprisonment. See *United States v. Watts*, No. 12-CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

44.     In its sentencing memorandum in the Watts case, the Government explained that "[f]or years," "the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

45.     The government revealed that, for years, Defendants Watts and Mohammed extorted tens of thousands of dollars of bribes from individuals at the Ida B. Wells public housing complex on numerous occasions as part of their duties with the Chicago Police Department.

46.     During the sentencing hearing, the government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in in the course of his career as a police officer," specifically noting that during the federal investigation Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. Had him arrested on drug charges. And the source … felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

47.     Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay the magnitude of Watts's criminal enterprise.

9

48. Notwithstanding the evidence that investigators had amassed over the years pointing to a wide, decade long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved other than the two officers who were arrested."

## The City's "Code of Silence"

49. While the federal government was investigating Watts and his crew, a "code of silence" existed within the Chicago Police Department.

50. Under this code, police officers are expected to conceal each other's misconduct, in contravention of their sworn duties, and penalties for breaking the code of silence within the CPD are severe.

51. As one CPD officer has explained, "[the Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

52. Pursuant to this "code of silence," each of the Defendant Officers concealed from Mr. Thomas evidence that Watts and his teammates were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed to Mr. Thomas, he would have used it to impeach the officers' accounts of

his arrest, which would have changed the outcome of the criminal proceedings instituted against him.

53. Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, and Watts and his crew continued to engage in misconduct with impunity.

### Careers of CPD Officers Daniel Echeverria and Shannon Spaulding Are Nearly Ruined

54. For example, in 2006, two Chicago police officers, Daniel Echeverria and Shannon Spaulding learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

55. Officer Echeverria took the allegation seriously and he reported it to a CPD supervisor. The supervisor made clear that he was not interested in learning about the allegation, and he directed Echeverria not to document the allegations.

56. Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and Spaulding began cooperating with the FBI, actively assisting the FBI's investigation of Watts and his crew.

57. When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

58.     Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

### CPD Officer Michael Spaargaren's Life Is Threatened

59.     Sometime in the mid-2000s, a CPD officer named Michael Spaargaren was assigned to work with Watts in public housing.

60.     Spaargaren observed that Watts did not inventory drugs and money that the officers seized during arrests, and Spaargaren confronted Watts about the misconduct.

61.     In response, Watts threatened to put a false case against Spaargaren and made veiled threats to kill him.

62.     A CPD Lieutenant in the chain of command subsequently warned Spaargaren to keep his mouth shut, or his life would be in danger.

63.     Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than to continue to work under Watts.

### Citizen Complaints Go Nowhere

64.     Defendants Watts, Mohammed, and other members of Watts's tactical team had accumulated dozens of citizen complaints concerning violations of their civil rights over the years, beginning well before the misconduct Defendants committed against Mr. Thomas.

65.     On information and belief, not a single one of these complaints resulted in any discipline against any member of Watts's crew.

66. On information and belief, complaints that the City bothered to investigate largely boiled down a he-said-she-said between the officer and the citizen, and the City's policy is to resolve those disputes in the officers' favor, no matter how many citizens come forward with the same type of complaint.

### The City Turns a Blind Eye to the Clear Pattern of Misconduct that Emerged from Watts and His Crew

67. Despite all of the evidence of a pattern and practice of criminal misconduct by the Defendant Officers that had amassed over the years, on information and belief, the City never undertook its own investigation of the clear pattern of criminal misconduct that emerged from the evidence.

68. As City officials were aware, however, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to impose discipline and control of the City's Police Department.

69. Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers. Nevertheless, the City completely abdicated this responsibility.

70. During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were committing ongoing criminal activity on the streets—extorting drug dealers and framing citizens of crimes they did not commit—yet City officials took no steps to prevent such abuses from occurring.

71. Instead, City officials let officers on Watts's crew continue to institute criminal charges against citizens like Mr. Thomas.

13

72. Even worse, City officials withheld information they had about the Defendant Officers' pattern of misdeeds, information that citizens like Mr. Thomas could have used to impeach the corrupt officers and defend against the bogus criminal charges placed upon him.

### Mr. Thomas' Damages

73. Mr. Thomas lost years of his life and was subjected to police harassment and unfair criminal proceedings before he was finally exonerated.

74. The emotional pain and suffering caused by being wrongfully incarcerated has been significant. Mr. Thomas was deprived of the everyday pleasures of basic human life; his freedom was taken from him. Since then, Mr. Thomas has had to live with a felony record he did not deserve.

75. As a result of the foregoing, Mr. Thomas has suffered emotional damages, all proximately caused by Defendants' misconduct.

### Count I: 42 U.S.C. § 1983 – Due Process

68. Each paragraph of this Complaint is incorporated as if restated fully herein.

69. In the manner described more fully above, the Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process.

70. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff, from Plaintiff's public defender, and from state prosecutors, among others, as well as knowingly fabricated

14

false evidence, thereby misleading and misdirecting Plaintiff's public defender and the state prosecutors.

71. Likewise, in the manner described more fully above, Defendants Philip J. Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified CPD supervisors, had knowledge of a pattern of misconduct by Watts and his team. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Mr. Thomas and other residents of the Ida B. Wells complex, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

72. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of the Defendant Supervisory Officers, or were proximately caused when the Defendant Supervisory Officers were deliberately and recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

73. In addition, the Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. Thomas, specifically information about Watts's and his team's pattern of misconduct. In this way, the Defendant Supervisory Officers violated Mr. Thomas's due process right deliberately and with reckless disregard to Mr. Thomas's constitutional rights.

74. The Defendants' misconduct directly resulted in the unjust criminal convictions of Plaintiff, thereby denying him his constitutional right to due process

15

guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

75.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence. The Defendants' actions were taken under color of law and within the scope of their employment.

76.     The City of Chicago is directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights and also because the actions of the final policymaking officials for Defendant City of Chicago and the CPD were the moving force behind the violation of Plaintiff's rights.

77.     At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. Thomas by concealing exculpatory evidence of the Defendant Officers' patterns of misconduct.

78.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals like Mr. Thomas were

routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

79. As a matter of both policy and practice, the Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. The Defendant City's actions led and continue to lead police officers in the City of Chicago to believe that their actions will never be scrutinized. Therefore, it directly encourages further abuses such as those that affected Plaintiff.

80. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the City exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because the Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious.

81. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

82. Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of the Defendant City of Chicago in

17

that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

83.     Indeed, municipal policymakers have long been aware of the Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take meaningful action to remedy the problem.

84.     For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

85.     Likewise, in June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

86.     In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct. The

JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board.

87. Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

88. As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

89. Indeed, by its own admissions, over 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred.

90. Notably, Defendants Watts and Mohammed are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

90. For example, in 2005, at least 1,592 complaints of civil rights violations were lodged against Chicago police officers with the Internal Affairs Division. A total of five were sustained, and that total may include cases arising in previous years.

91. In other words, IAD sustained only 0.314% of the complaints that its police officers had committed civil rights violations in 2005.

19

92.     In 2006, the number of civil rights complaints was 1,492. Twelve were sustained. Based on those numbers, IAD sustained only 0.8% of the civil rights complaints against Chicago police officers in 2006.

93.     The same unconstitutionally lax oversight is evident across the multiple entities that have been responsible for investigating police misconduct. In 2006, for example, the Office of Professional Standards ("OPS"), which investigates complaints of excessive force, sustained only 57 out of 2,391 complaints of excessive force by police officers, or 2%.

94.     Notably, Defendants Watts and his team are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

95. Likewise, in 2001, Chicago police officer Joseph Miedzianowski was convicted on federal criminal charges, including racketeering and drug conspiracy. The jury found that Miedzianowski's engaged in corruption for much of his 22-year police career, using street informants to shake down drug dealers and sell drugs.

96.     Miedzianowski, like the Defendant Officers in this case, had accumulated dozens of complaints over the years, which the Defendant City routinely deemed unfounded or not sustained.

97.     For instance, in 2011, Chicago police officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

98.     Finnigan was part of a group of officers in the Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

99.     Finnigan and his crew engaged in their misconduct at around the same time that Mr. Thomas was target by Defendant Watts and his crew.

100.    Finnigan, like the Defendant Officers in this case, had accumulated dozens of complaints over the years, which the Defendant City routinely deemed unfounded or not sustained.

101.    At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

102.    In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill.), a federal jury found that as of 1994 the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

103.    Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.) , a federal jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

104.    The same constitutionally-defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case were also in place in 2003, when Mr. Thomas suffered the abuse described above.

21

105. The same code of silence in place at the CPD during the time periods at issue in the in the *Klipfel* case and in the *Obrycka* case were also in place in 2003, when Mr. Thomas suffered the abuse described above.

106. Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continue to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

107. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

108. The Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relative straight-forward nature of many misconduct claims.

109. Although the Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

110. Instead, the Defendant City continues to inadequately investigate citizen complaints. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

111. Plaintiff's injuries were caused by officers, agents, and employees of the Defendant City of Chicago and the Chicago Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### Count II: 42 U.S.C. § 1983 – Due Process – Malicious Prosecution and Unlawful Pretrial Detention

112. Each paragraph of this Complaint is incorporated as if restated fully herein.

113. In the manner described more fully above, the Defendants, acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

114. In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

115. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury to Plaintiff.

116. Defendants deprived Plaintiff of a fair criminal proceeding, including the chance to defend himself, resulting in a deprivation of liberty.

117. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally

framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence.

118. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence. The Defendants' actions were taken under color of law and within the scope of their employment.

119. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

120. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

Count III: 42 U.S.C. § 1983 – Failure to Intervene

121. Each paragraph of this Complaint is incorporated as if restated fully herein.

122. In the manner described more fully above, during the constitutional violations described herein, the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

123. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

124. The Defendants' actions were taken under color of law and within the scope of their employment.

125. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

126. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count IV: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

127. Each paragraph of this Complaint is incorporated as if restated fully herein.

128. Prior to Plaintiff's convictions, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for crimes he did not commit and thereby to deprive him of his constitutional rights, all as described above.

129. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

130. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

131. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

132. The Defendants' actions were taken under color of law and within the scope of their employment.

133. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

134. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count V: Illinois Law – Malicious Prosecution

135. Each paragraph of this Complaint is incorporated as if restated fully herein.

136. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

137. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

138. The Defendants' actions were taken under color of law and within the scope of their employment.

139. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VI: Illinois Law – Intentional Infliction of Emotional Distress

140. Each paragraph of this Complaint is incorporated as if restated fully herein.

141. The actions, omissions, and conduct of the Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

27

142.   The Defendants' actions were taken under color of law and within the scope of their employment.

143.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Illinois Law – Civil Conspiracy

144.   Each paragraph of this Complaint is incorporated as if restated fully herein.

145.   As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for crimes he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

146.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

147.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

148.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional

28

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Illinois Law – *Respondeat Superior*

149.    Each paragraph of this Complaint is incorporated as if restated fully herein.

150.    While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

151.    Defendant City of Chicago is liable as principal for all torts committed by their agents.

## Count IX: Illinois Law – Indemnification

152.    Each paragraph of this Complaint is incorporated as if restated fully herein.

153.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

154.    Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

## CONCLUSION

WHEREFORE, Plaintiff Henry Thomas respectfully requests that this Court enter a judgment in his favor and against the City of Chicago, former Chicago Police

Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Kenneth Young, Jr., Officer Calvin Ridgell, Jr., Officer Gerome Summers, Jr., Officer Ronald Heard, Officer Daryl Akins, Police Superintendent Philip Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified officers and employees of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Henry Thomas hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Theresa Kleinhaus
One of Plaintiff's Attorneys

Jon Loevy
Arthur Loevy
Scott Rauscher
Theresa Kleinhaus
Joshua Tepfer
Sean Starr
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Phone: (312) 243-5900